UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 05-23126-CV-GRAHAM

AUGUSTO RADA, individually and
as Personal Representative of
the Estate of Cesar Rada,

        Plaintiff,

vs.

MIAMI-DADE COUNTY, FLORIDA,
and OFFICER JEFFREY PRICE,

        Defendants.
_____/

**ORDER**

**THIS CAUSE** comes before the Court on Defendant Miami-Dade
County's Motion for Summary Judgment and Supporting Memorandum of
Law [D.E. 87] and Defendant Officer Jeffrey Price's Motion for
Summary Judgment and Supporting Memorandum of Law [D.E. 69].

**THE COURT** has considered the Motions, the pertinent portions
of the record, and is otherwise duly advised in the premises.

**I. INTRODUCTION**

Plaintiff, Augusto Rada, brings this action in his capacity as
the personal representative of the estate of Cesar Rada.  Augusto
Rada is also the father of Cesar Rada and an eye witness to the
events that underlie this action.  Plaintiff's claims arise out of
the March 13, 2005 shooting death of Cesar Rada by Miami-Dade
Police Department ("MDPD") Officer Jeffrey Price.  The Second
Amended Complaint, the operative complaint in this action, contains
six (6) counts: four (4) against Miami-Dade County (the "County")

and two (2) against Officer Price in his individual capacity.

Counts I and III allege claims pursuant to 42 U.S.C. § 1983 against the County for deliberate indifference and wrongful death. The County has moved for summary judgment on these claims on two grounds: "[f]irst, the undisputed facts demonstrate that [Officer] Price did not use 'unreasonable' force on [Cesar] Rada. Second, even if [Officer] Price used unreasonable force, it was not the result of the County's deliberate indifference to a need to train its police officers..."

Count V alleges a violation of Title II of the ADA against the County. According to Plaintiff, the County discriminated against Cesar Rada by denying him services on the basis of his disability and/or failed to make reasonable modifications to its policies to ensure that the needs of persons with disabilities are met. The County has moved for summary judgment on this claim on the grounds that Cesar Rada was not a qualified person with a disability, and/or he was not denied a benefit by reason of his disability, and/or Plaintiff is not entitled to compensatory damages under the ADA.

Count VI of the Second Amended Complaint is a Florida wrongful death claim against the County. Plaintiff alleges that Officer Price acted negligently when he used excessive force against Cesar Rada and that the County is liable because Officer Price's actions were taken during the course and scope of his employment. The County has moved for summary judgment on this claim on the grounds

that "Florida law is clear...that there is no cause of action for negligent use of excessive force by a police officer."

Counts II and IV allege § 1983 claims against Officer Price for violation of Cesar Rada's fourth amendment right to be free from excessive force and for wrongful death. Officer Price has moved for summary judgment on these claims on the grounds that he is entitled to qualified immunity.

For the reasons explained below, the Court must: (1) **GRANT** Defendant Miami-Dade County's Motion for Summary Judgment and Supporting Memorandum of Law [D.E. 87]. Counts I, III, and V are **DISMISSED**, with prejudice. Count VI is **DISMISSED**, without prejudice; and (2) **DENY** Officer Jeffrey Price's Motion for Summary Judgment and Supporting Memorandum of Law [D.E. 69]. Counts II, and IV remain pending against Officer Price.

## II. UNDISPUTED FACTS

In 2001, at approximately twenty-seven (27) years of age, Cesar Rada was diagnosed with bipolar disorder along with symptoms of schizophrenia. [D.E. 93, Tab 1][1]. Despite the diagnosis, he obtained a degree from Miami Dade Community College, and was attending Florida International University. Id. Periodically, however, Cesar Rada experienced mental health crises. [D.E. 88, ¶

---

[1]Deposition of Augusto Rada.

3

9][2]. His treating doctors told his parents, Augusto and Rita Rada, to call 911 for assistance when he went into crisis. [D.E. 93, Tab 1]. Between 2001 and 2005, he experienced eight (8) or nine (9) crises that necessitated emergency calls to the MDPD. [D.E. 88, ¶ 9]. Upon responding, MDPD officers either transported Cesar Rada to a treatment facility or allowed him to remain at home, where he lived with his parents. [D.E. 93, Tab 1]. Augusto Rada described those eight (8) or nine (9) interactions with the MDPD as going "[v]ery smoothly." [D.E. 88, ¶¶ 9, 10].

**A. March 12, 2005, The Day Before the Shooting**

On the morning of Saturday March 12, 2005, Cesar Rada had a "tense gaze" that indicated to his father that Cesar Rada was beginning to experience another crisis. [D.E. 93, Tab 1]. As a result, Augusto Rada decided not to go to work. Id. Instead, he went to visit the home of his brother-in-law, Marco Montealegre, to discuss Cesar Rada's crisis. Id. Mr. Montealegre told Augusto Rada to "watch him (Cesar Rada)." Id. They did not call any medical personnel or the police at that time. Id. Upon returning home in the afternoon, Augusto Rada encountered a more agitated Cesar Rada who told him to "go away." Id. Augusto Rada complied and did not return home until later that evening to wait for his wife to return from work. Id. When his wife returned from work at

---

[2]Statement of Undisputed Material Facts in Support of Defendant Miami-Dade County Florida's Motion for Summary Judgment.

4

about 6:30 p.m., Augusto Rada greeted her outside of the house, and told her that Cesar Rada was going into crisis.  Id.  They left the house, without Mrs. Rada ever entering, and decided to spend the night at their other son's house, the house of Carlos Rada.  Id.

**B.  March 13, 2005, The Day of the Shooting**

The following day, Augusto Rada and Carlos Rada met at Mr. Montealegre's house to decide what to do about Cesar Rada's worsening condition.  Id.  They decided that the three of them should go to visit Cesar Rada to try to help him.  Id.

Upon arriving at his house, Augusto Rada went to the kitchen where he noticed a "cup or a glass broken on the floor."  Id.  He did not see Cesar Rada but did hear him shouting, and talking loudly to himself.  Id.  According to Augusto Rada, "[i]t seemed to me--it probably wasn't, but as if he was arguing with somebody. But at the same time, he would be saying things that did not really make sense..."  Id.  After not seeing Cesar Rada in the house, Augusto Rada exited and went to the external door that led to Cesar Rada's bedroom.  Id.  Cesar Rada's bedroom was attached to the house, but entry could only be gained through an external door. Id.  Augusto Rada called out to Cesar Rada.  Id.  Cesar Rada responded by opening his door and saying, "[g]et out of here...I don't need nothing. Get out of here."  Id.  Augusto Rada then stepped back from the door and motioned for Carlos Rada and Mr. Montealegre to do the same.  Id.  Augusto Rada, Carlos Rada, and

Mr. Montealegre decided it was best to leave because they "did not want to get him (Cesar Rada) more excited." Id. They then exited the front gate. Id. Cesar Rada followed them out and broke the gate in the process. Id. Augusto Rada explained, "[h]e wanted to open it, but the door opens towards the inside. In wanting to go out--that is what I suppose he wanted to do--he pushed it with his two hands, like saying [it is] going to open or not." Id.

After Cesar Rada broke the gate, Augusto Rada told Mr. Montealegre that Cesar Rada "needs help," and for him to "call 911." Id. According to the transcript of the 911 call made by Mr. Montealegre, the call was placed at 7:58 p.m., and Mr. Montealegre told the 911 dispatcher, "I have a nephew who is mental--he has a problem. He is going through a crisis, and he has become very violent." [D.E. 90, Tab 9][3]. Cesar Rada overheard and responded, "I'm not scared about that. Are you going to call so that I can be taken? I'm not scared about that." [D.E. 93, Tab 1]. Cesar Rada then proceeded to walk towards Mr. Montealegre. Id. Mr. Montealegre backed up in response to Cesar Rada's advance. Id. To stop Cesar Rada's advance towards Mr. Montealegre, Carlos Rada called out to Cesar Rada that "[w]e came here to help you." Cesar Rada responded by saying, "[n]o, I don't need help. Leave. Leave. Leave," and then started walking towards Carlos Rada. Id. Carlos Rada also backed up in response to Cesar Rada's advance. Id.

---

[3]Transcription of Taped 911 Recordings.

According to Augusto Rada, this continued for a "[long] distance," maybe "20, 25 feet." Id. As Cesar Rada was advancing towards Carlos Rada, Cesar Rada told Carlos Rada that he was going to "kick--kick your ass. Kick your ass." Id. Cesar Rada then suddenly stopped his advance towards Carlos Rada, and turned his back on him. Id. According to Augusto Rada, "[t]hen is when the police appeared." Id.

Several calls were placed to 911 in response to this scene in front of the Rada residence. [D.E. 90, Tab 9]. After Mr. Montealegre's call at 7:58 p.m., a neighbor called 911 at 8:02 p.m., and said, "[t]here is someone outside on the street yelling at somebody that they are going to kill them...somebody is yelling at somebody, and they are saying, swearing and everything else, they are saying, 'I'm just going to kill you.'" Id. Mr. Montealegre placed another call to 911 at 8:05 p.m. and said, "[t]his guy is bipolar and he is having a crisis right now." Id. Mr. Montealegre ended the phone call when he saw the police coming. Id.

Presumably, based on these 911 calls, the police dispatcher informed the MDPD officers on their way to the Rada residence that they were going to a "violent dispute," "[subject] is a mental patient," and "be advised they hear yelling, and saying, 'I am going to kill you.'" [D.E. 90, Tab 10][4].

---

[4]Transcription of Police Dispatch Recordings.

7

When the police arrived, Carlos Rada went over to talk to them. [D.E. 93, Tab 2][5]. At his deposition, he testified that he stood at the driver's side door, within earshot of the passenger, and said that Cesar Rada was bipolar and in crisis. Id. Officer Price, "[t]he one that [was] on the passenger side," exited the car. [D.E. 93, Tab 1]. Upon exiting the car, Officer Price began to shout at Cesar Rada, "hey you. Hey you...come here. Come here." Id. According to Augusto Rada, Cesar Rada turned in response, "[h]e was moving his hands...He was tense, tense, tense." Id. Cesar Rada then began "slowly" walking towards Officer Price and said, "are you calling me that way? Are you calling me that way?" Id. That is when Officer Price "drew the gun out." Id. Cesar Rada continued towards Officer Price saying,"do you want to shoot at me?" Id. Cesar Rada "raised his arms and went walking, walking. 'You want to shoot at me? You want to shoot at me?' He was screaming. [Officer Price] was saying, 'stay back, stay back.'" Id.

Eye witnesses, Carlos Rada, Augusto Rada, and Mr. Montealegre, differ in their accounts of what happened next. According to Augusto Rada, "[m]y son was coming close, coming close. And he said, 'you want to shoot me? Shoot me. You want to shoot me? Shoot me. Shoot me. Shoot me.' And the guy shot him," "I saw fire coming out of the mouth of the revolver. If you are at this

---

[5]Deposition of Carlos Rada.

8

distance from the revolver and I saw the mouth from where I was, that fire was coming out, my son was--from his body, <u>he was about three feet away.   But from the mouth of the revolver, he was closer.</u>"   <u>Id</u>.   According to Carlos Rada, "they came to approximately <u>maybe four feet</u>," when Officer Price fired.   [D.E. 93, Tab 2].   According to Mr. Montealegre, they were <u>"four [4], five [5] feet"</u> away from each other, and "[t]here was a point, a few seconds in which he stayed like this saying something to the police.   Both of them.   Let's put it this way, <u>Cesar didn't move</u>. The police did not move...[a]nd at that point I heard the shots..." [D.E. 93, Tab 4][6].   At 8:06 p.m., another caller into 911 said, "[t]here is some shooting in the street behind me.   There was some screaming and--." [D.E. 90, Tab 9].   Based on the timing of the phone calls to 911, it is estimated that Officer Price's interaction with Cesar Rada lasted less than two (2) minutes.   <u>Id</u>.

### C.   MDPD History of Shootings of the Mentally Ill

Miami-Dade County has more mentally disturbed people living within its borders than any other county in the United States. [D.E. 96, ¶ 2][7].   Between 2002 and 2005, MDPD officers shot six (6) mentally ill persons.   [D.E. 47[8], ¶ 33; D.E. 88, ¶ 48].   There is

---

[6]Deposition of Marco Montealegre.

[7]Plaintiff's Response to Miami-Dade County's Statement of Material Facts; and Plaintiff's Counter-Statement of Material Facts as to Which There Exists a Genuine Issue to be Tried.

[8]Second Amended Complaint.

9

no evidence in the record that any of those shootings were found to have involved constitutional violations.  There is also no evidence in the record that any MDPD officers have ever been involved in a shooting with a mentally ill subject in which the subject's constitutional rights were found to have been violated.

D.  MDPD Training to Deal with the Mentally Ill

During Basic Training, all MDPD officers receive a twelve (12) hour Mental Illness Training Module.  [D.E. 90, ¶ 8][9].  The MDPD has been providing this training since at least 2002.  Id.  In June 2002, then MDPD Director, Carlos Alvarez, implemented a training program known as Managing Encounters with the Mentally Ill (MEMI)-Community Oriented Policing (COP).  [D.E. 88, ¶ 36].  During Phase I of the MEMI-COP training, all uniformed MDPD officers receive sixteen (16) hours of training that includes how to deal with the mentally ill, and techniques on how to de-escalate situations involving encounters with the mentally ill. [Id; D.E. 96, ¶¶ 8, 9].  By July, 2003, 1800 uniformed MDPD officers had been trained using MEMI-COP.  [D.E. 88, ¶ 36].  In August, 2003, Phase II, which provided training to non-uniformed support and investigative police personnel, began.  [D.E. 88, ¶ 36].

In 2004, Alvarez' successor, Robert Parker, announced a new three-tiered approach for training to deal with the mentally ill. [D.E. 96, ¶ 12].  Under this new approach, all uniformed and non-

---

[9] Declaration of Major Bernardo J. Gonzalez.

10

uniformed personnel would continue to receive the MEMI-COP training as the tier one level of training.  [D.E. 96, ¶ 12].

As tier two, all field training officers were to receive a forty (40) hour Crisis Intervention Team (CIT) training for dealing with the mentally ill.  [D.E. 96, ¶ 14].  Under tier two as ordered by Parker, once a field training officer completed the CIT training, he was supposed to ask the dispatcher to be assigned to any call involving the mentally ill.  [D.E. 90, Tab 12, Attachment A, Page 9].  Parker directed the implementation of tier two in July, 2004.  Id.  As a result of that directive, thirty-one (31) MDPD officers received CIT training from January 10-14, 2005, and twenty-one (21) MDPD officers received CIT training from February 28-March 4, 2005.  [D.E. 96, ¶ 20; D.E. 88 ¶ 42].  The MDPD has continued to send officers to CIT training, and in 2005, over 300 MDPD officers received CIT training.  [D.E. 88, ¶ 43].

Tier three is the Special Response Team ("SRT") Negotiator. [D.E. 88, ¶ 44].  These teams consist of twenty-seven (27) officers, assigned to three (3) geographically-based teams.  Id. SRT negotiators are specially trained to deal with various volatile situations, including encounters with the mentally ill.  Id.  Each SRT negotiator is required to take an additional eight (8) hours of monthly training.  Id.

### E. Perceived Flaws in MDPD Training, as Identified by Plaintiff

In 2002, Miami-Dade County's Mental Health Committee

11

recommended that the MDPD adopt the forty (40) hour CIT training method for dealing with the mentally ill. [D.E. 96, ¶ 4,5]. The MDPD director at that time disagreed with the Committee's recommendation and instead instituted the MEMI-COP method of training. [Id. at ¶ 7]. According to Plaintiff, MEMI-COP was inadequate because "only" eight (8) hours of the sixteen (16) hour training is directed towards dealing with the mentally ill, and less than one (1) hour is devoted to actual techniques on how to de-escalate encounters. [Id. at ¶¶ 8, 9]. In 2004, after the shooting of Randy T. Baker, a mentally ill man, the County reevaluated its training methods and decided to implement the CIT training for its field training officers. [Id. at ¶ 16]. According to Plaintiff, the MDPD should have adopted CIT training in 2002, instead of MEMI-COP training, because the Committee had recommended CIT training as the "best available means to prevent violence against the mentally ill." [Id. at ¶¶ 6, 20]. Further, according to Plaintiff, even after implementation of CIT training, the MDPD had no policies in place to enforce Parker's July, 2004 directive requiring CIT trained field training officers to respond to the scene of disturbances caused by the mentally ill. [Id. at ¶¶ 20, 26].

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file,

12

together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©.  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-324 (1986).  That burden is discharged if the moving party shows the Court that there is "an absence of evidence to support the nonmoving party's case." <u>Id</u>. at 325.  Once the moving party has discharged its burden, the nonmoving party must designate <u>specific</u> <u>facts</u> showing that there is a genuine issue of material fact.  <u>Id</u>. at 324.

The nonmoving party may <u>not</u>:

> rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

Issues of fact are "genuine" only if a reasonable jury considering the evidence presented could find for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Material facts are those that will affect the outcome of the trial under governing law.  <u>Id.</u> at 248.  In determining whether a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  <u>Id</u>. at 261n.2.

13

All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party.  Hayden v. First Natl. Bank of Mt. Pleasant, 595 F.2d 994, 996-97 (5th Cir. 1979).  The court may not weigh the credibility of the parties on summary judgment.  Rollins v. TechSouth, Inc., 833 F.2d 1525, 1531 (11th Cir. 1987).  If the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact.  Id.

## IV. DISCUSSION

### A. Deliberate Indifference-Counts I and III

"There is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers..." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing Monell v. Dept. of Soc. Svcs., 436 U.S. 658, 691 (1978)).  "Instead, a municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation."  Id. at 1350.  "A failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact.'"  Cook v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1116 (11th Cir. 2005).  The Supreme Court has cautioned however that a "failure to train" claim can be the basis for § 1983 liability only in "limited

14

circumstances." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 387 (1989).

"To establish...'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." <u>Gold</u>, 151 F.3d at 1350-51. This generally requires the Plaintiff to show a history of "prior incident[s] in which constitutional rights were similarly violated." <u>Id</u>. at 1351. However, "in <u>City of Canton</u>..., the Supreme Court in dictum left open the possibility that a need to train could be 'so obvious,' resulting in a City's being liable without a pattern of prior constitutional violations." <u>Id</u>. at 1352. In any event, the "deliberate indifference" standard is a "stringent standard of fault..." <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 410 (1997).

In this case, there is no evidence in the record of any prior constitutional violations of the rights of the mentally ill. There were seven (7) shootings of the mentally ill by MDPD officers between 2002 and 2005. However, as stated, none of them were found to be the result of constitutional violations. Thus, Plaintiff is left with stating a claim for failure to train based on an "obvious" need. <u>City of Canton</u>, 489 U.S. at 390.

Regarding an "obvious" need, the Supreme Court in <u>Board of County Commissioners of Bryan County, Oklahoma</u>, explained, "[i]n leaving open in <u>Canton</u> the possibility that a plaintiff might

15

succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officials with specific tools to handle recurring situations." Id. at 1385. However, in showing this "obvious" need for training, a plaintiff must show that there was a "deliberate choice not to take any action," and not just that there were "imperfections" in the actions that were taken. Gold, 151 F.3d at 1350-51.

In this case, the County took action to implement programs to manage encounters with the mentally ill. According to Plaintiff, the County should have implemented the forty (40) hour CIT training in 2002 instead of the sixteen (16) hour MEMI-COP training that it decided to implement. However, the County's decision not to implement CIT training in 2002 does not rise to the level of an "obvious" failure to train. Plaintiff has introduced some expert testimony, via the affidavits of Darlene Adams, and George Kirkham, that suggest that the MEMI-COP training provided by the County was inadequate. "However an expert's conclusory testimony does not control this Court's legal analysis of whether any need to train...was obvious enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice of that need." Gold, 151 F.3d at 1352n.13. The Court finds that in this case, without any prior violations of the constitutional

16

rights of the mentally ill, the County was not on notice of an "obvious" need to train.

**B.   Title II of the ADA-Count V**

Count V of the Second Amended Complaint alleges that the County violated Cesar Rada's rights under Title II of the ADA by "failing to make reasonable modifications to their policies, practices and procedures to ensure that his needs as an individual with a disability would be met." Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Therefore, to obtain summary judgment, the County must show that there are no facts in the record from which Plaintiff could establish that Cesar Rada, "(1) [was] a 'qualified individual with a disability;' (2) [was] 'excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'"  Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001).

As an initial matter, the Court must determine whether Title II of the ADA applied to the interaction between Officer Price and Cesar Rada.  This issue has never been addressed by the Eleventh

17

Circuit.   Two other Circuit Courts that have addressed the issue have come to two somewhat divergent conclusions. In <u>Hainze v. Richards</u>, 207 F.3d 795 (5th Cir. 2000), the Fifth Circuit held that Title II of the ADA does not apply to "an officer's on-the-street response to reported disturbances." However, in <u>Gohier v. Enright</u>, 186 F.3d 1216, 1221 (10th Cir. 1999), the Tenth Circuit refused to adopt such a broad rule and instead held that Title II does not categorically exclude arrests from its reach.  This Court finds the opinion of the Fifth Circuit in <u>Hainze</u> to be well reasoned and adopts the rationale set forth therein to hold that Title II of the ADA did not apply to Officer Price's interaction with Cesar Rada.

In <u>Hainze</u>, a sheriff's deputy shot and injured Mr. Hainze, a mentally ill man, after responding to a 911 call that he was creating a disturbance. <u>Id</u>. at 797.  Upon arriving at the scene, the deputy saw Mr. Hainze holding a knife while standing next to a pick up truck occupied by two people. <u>Id</u>.  The deputy exited his vehicle, drew his weapon, and ordered Mr. Hainze away from the pick-up truck. <u>Id</u>.  Mr. Hainze began to walk towards the deputy, while still holding the knife. <u>Id</u>.  Mr. Hainze ignored the deputy's warnings to stop, and the deputy shot him two (2) times in the chest. <u>Id</u>.  Approximately twenty (20) seconds had elapsed between the deputy's arrival at the scene and the shooting. <u>Id</u>.

Mr. Hainze later brought a claim against the county under Title II of the ADA in which he alleged that "the county failed to reasonably accommodate his disability by 'failing and refusing to

18

adopt a policy protecting [his] well-being, as a person with a mental illness in a mental health crisis situation, thus resulting in discriminatory treatment from [the] sheriff's deputies.'" Id. at 801. In reaching its holding, the Hainze court balanced the need for officers to comply with Title II with the need for officers to ensure their safety and the safety of the nearby public. The court explained:

> [l]aw enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.

Id. at 802 (emphasis added).

In this case, Officer Price had been at the Rada residence for less than two (2) minutes when the shooting occurred. He was attempting to speak with Cesar Rada just prior to the shooting, and had not yet assessed the nature of the exigent circumstances that brought him to the scene. One could not say, on the facts of this case, that the scene was secure and the officers and nearby civilians were without exposure to a risk of harm. Title II of the ADA was therefore not yet applicable to Officer Price's actions.

19

## C. Wrongful Death-Count VI

Count VI is a "cause of action for negligence" against the County under Florida statute.  Plaintiff alleges that Officer Price owed Cesar Rada "the duty to exercise reasonable care and judgment before using a deadly weapon and lethal force," and the "duty not to use excessive force."  Under Florida law, however, there is no cause of action for negligent use of excessive force by a police officer.  City of Miami v. Sanders, 672 So.2d 46, 47-48 (Fla. 3d DCA 1996).  In City of Miami, the court explained, "[t]he critical factor here, is that Sanders pleaded a cause of action for 'negligent' use of excessive force in making the arrest.  The problem with Sander's legal theory is that a suit for a police officer's use of excessive force necessarily involves the intentional tort of battery...Hence, we come to the inescapable conclusion that it is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort."  Id. at 48.  Plaintiff's negligence claim in Count VI for excessive force against the County therefore fails.[10]

---

[10]Plaintiff's response to the County's motion for summary judgment on Count VI of the Second Amended Complaint anticipated the Court's ruling and requested the opportunity to amend.  The Court finds that the interests of justice establish good cause to permit the amendment.  The Court has previously requested that Plaintiff file his proposed amendment to Count VI.  An amended Count VI, as part of Plaintiff's Third Amended Complaint, is therefore already a part of the record in this cause.  Defendant may respond to Count VI of the Third Amended Complaint within the time frame permitted by the Federal Rules of Civil Procedure.

D.   Qualified Immunity-Counts II and IV

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002)(citations omitted).   "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. at 1194 (citations omitted).

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. (citations omitted).   "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. (citations omitted).   The Supreme Court has established a two-part test for evaluating a claim of qualified immunity.   First, as a "threshold question," a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).   "If a constitutional right would have been violated under the plaintiff's

21

version of the facts, the court must then determine 'whether the right was clearly established.'" Lee, 284 F.3d at 1194 (citing Saucier, 533 U.S. at 201) (emphasis in original).

### (I) Discretionary Authority

Here, there can be no doubt that Officer Price was acting within his discretionary authority at the time of the shooting. Office Price, along with his partner, were at the Rada residence in response to several calls to 911 for assistance. Just prior to the shooting, Officer Price was apparently attempting to get Cesar Rada's attention after he was identified as the subject of the 911 calls. These tasks were within Officer Price's discretionary authority. The Court therefore finds that Officer Price has met his burden of proving that "'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Lee, 284 F.3d at 1194 (citations omitted).

### (ii) Violation of Fourth Amendment Right

According to Plaintiff, Officer Price violated Cesar Rada's fourth amendment right to be free from excessive force when Officer Price used deadly force. "Deadly force is 'reasonable' for the purposes of the Fourth Amendment when an officer (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of

22

deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force." Robinson v. Arruqueta, 415 F.3d 1252, 1255 (11th Cir. 2005)(citations omitted).

In this case, Officer Price testified in his sworn statement that he shot Cesar Rada because: (1) Cesar Rada never stopped in response to his commands; and (2)he was afraid that if Cesar Rada got any closer he would take his weapon and use it to kill him (Officer Price), his partner, or someone else. As an initial matter, it is undisputed that Officer Price never thought Cesar Rada had a weapon that could be used to cause harm. The only possible threat posed by Cesar Rada was through the use of his hands or if Cesar Rada took Officer Price's weapon. However, the testimony regarding Cesar Rada's distance from Officer Price at the time of the shooting, as well as the testimony regarding whether Cesar Rada stopped in response to Officer Price's commands is in dispute. According to Mr. Montealegre, an eye witness to the shooting, Cesar Rada actually stopped approximately five (5) feet away from Officer Price in response to Officer Price's commands, and it was not until Cesar Rada stopped that Officer Price shot him. According to Mr. Montealegre, "Cesar didn't move. The police did not move...[a]nd at that point I heard the shots..." If Mr. Montealegre's eyewitness testimony is accepted, as it must be at this summary judgment stage, then Officer Price's shooting of an unarmed Cesar Rada, who stopped his approach towards Officer Price, could not have been reasonable. Of course, "the 'reasonableness'

23

of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 397 (1989). However, this Court finds that a reasonable officer on the scene would not have shot the unarmed Cesar Rada if in fact Cesar Rada had actually stopped in response to the officer's commands.

Officer Price argues that the Court should not accept Mr. Montealegre's eyewitness account of what happened at the time of the shooting because the testimony given by Mr. Augusto Rada does not nicely dovetail with Mr. Montealegre's. According to Officer Price, when this occurs, the Court must accept the testimony of the party witness over the testimony of other witnesses. Officer Price cites to Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005) in support of his position. In Evans, the Eleventh Circuit explained, "[w]hen the nonmovant has testified to events, we do not...pick and choose bits from other witnesses' essentially incompatible accounts...and then string together those portions of the record to form the story that we deem most helpful to the nonmovant." Id. at 1278. This Court finds that application of the Evans rule, in this case, would lead to an inequitable result not contemplated by the Eleventh Circuit.

Plaintiff, Augusto Rada, brings this action in his capacity as representative of the estate of Cesar Rada. The Court is unaware of any reason why this same action could not have been brought with Cesar Rada's mother, Rita Rada, as the representative. Had Mrs.

24

Rada, or any other legally permissible person, been the representative, then the Court, under Officer Price's reasoning, would have been able to consider the testimony of all of the eyewitnesses, including that of Mr. Montealegre. The fortuitous happening that Mr. Augusto Rada is also the representative and an eye witness should not thwart the Court in its search to find the truth in this matter.[11]

### (iii) Clearly Established

Having found that a violation of Cesar Rada's rights could be found on Plaintiff's version of the facts, the Court must now determine whether those rights were clearly established. Lee, 284 F.3d at 1194. Based on longstanding Eleventh Circuit precedent, it is clearly established that an officer may not use deadly force against a subject that is compliant with the officer's orders. Smith v. Mattox, 127 F.3d 1416, 1419-20 (11th Cir. 1997).

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Defendant Miami-Dade County's Motion

---

[11]At a hearing on Defendant's summary judgment motion held by the Court on November 30, 2006, the Court gave Plaintiff leave to seek the appointment of another representative. Plaintiff obtained the appointment of Angelica Ulloa as co-personal representative. On December 4, 2006, Plaintiff filed a Motion to Amend Complaint by Interlineation to Substitute Angelica Ulloa for Augusto Rada as Party Plaintiff [D.E. 127]. Defendant filed its Response [D.E. 129] on December 5, 2006. The Court finds that good cause, as well as the interest of justice support granting Plaintiff's Motion to Amend Complaint by Interlineation to Substitute Angelica Ulloa for Augusto Rada as Party Plaintiff [D.E. 127].

for Summary Judgment and Supporting Memorandum of Law [D.E. 87] is **GRANTED**.   Counts I, III, and V are **DISMISSED**, with prejudice. Count VI is **DISMISSED**, without prejudice.   It is further

ORDERED AND ADJUDGED that Officer Jeffrey Price's Motion for Summary Judgment and Supporting Memorandum of Law [D.E. 69] is **DENIED**.   Counts II, and IV remain pending against Officer Price.

DONE AND ORDERED in Chambers at Miami, Florida, this 7th day of December, 2006.

_____
DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record

26